IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs January 21, 2026

## STATE OF TENNESSEE v. SCOTT A. STINER

**Appeal from the Criminal Court for Union County**
**No. 5481    Zachary R. Walden, Judge**

_____

### No. E2025-00538-CCA-R3-CD

_____

The Defendant, Scott A. Stiner, was convicted by a Union County Criminal Court jury of soliciting sexual exploitation of a minor, a Class C felony, and four counts of aggravated sexual battery of a child less than thirteen years of age, a Class B felony. *See* T.C.A. §§ 39-13-529 (soliciting sexual exploitation of a minor)[1] (2018) (subsequently amended), 39-13-504 (aggravated sexual battery) (2018) (subsequently amended). The trial court sentenced the Defendant to an effective fifty-four-year sentence. On appeal, the Defendant contends that (1) he did not receive a fair trial because the allegations and acts that constitute the basis of the convictions were different than the allegations in the indictment and the bill of particulars; (2) the court erred by failing to sever the offenses during the trial; (3) the evidence is insufficient to support his aggravated sexual battery of a child less than thirteen years of age conviction in Count 6; (4) he did not receive a unanimous verdict for aggravated sexual battery in Count 3; (5) the court erred by denying his motion for a mistrial; (6) the court erred in admitting evidence in contravention of Tennessee Rule of Evidence 404(b); (7) the court erred in admitting a diagram that was not properly authenticated; (8) the court erred by allowing expert testimony that went beyond the scope of the witness's expertise; and (9) the court erred by ordering consecutive sentencing on all counts. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

---

[1] The State represented in its appellate brief that the judgment form in Count 2, for soliciting sexual exploitation of a minor less than thirteen years of age, should be corrected because the indictment did "not contain the elements of solicitation" and "the jury was not instructed on the elements of solicitation." We disagree with the need for a corrected judgment. The relevant statute heading as it existed in the code at the time of the offenses included the term "soliciting" in the name of the offense, and the statute contains its own definition of solicitation.

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., J., joined. STEVEN W. SWORD, J., filed a concurring opinion.

Jordan Long, Tazewell, Tennessee, for the appellant, Scott A. Stiner.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Senior Assistant Attorney General; Jared Effler, District Attorney General; and Andrea L. Bridges, Joseph Duncan, and Rondeau Laffitte, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to a period between July 30, 2018, and August 6, 2018,[2] when he and his then-girlfriend, Carissa Rudd, allowed four young girls, L.I., M.N., K.N., and A.N.,[3] who were cousins, to stay at the Defendant's house. As a result of the Defendant's and Ms. Rudd's actions during that time, the Union County Grand Jury indicted Ms. Rudd in Count 1 and the Defendant in Count 2 for soliciting sexual exploitation of a minor less than thirteen years of age and indicted the Defendant in Counts 3 through 7 for aggravated sexual battery.[4] The trial court dismissed Count 7, and the jury convicted the Defendant as charged. Ms. Rudd pleaded guilty pursuant to a plea agreement for Count 1.

At the trial, L.I. testified that she was age fifteen. L.I. said that she previously lived in Tennessee and that Alisha Barison, her aunt, lived in Union County. L.I. confirmed that she had a good relationship with her cousins, M.N., K.N., and A.N. She said that, at the time of the trial, M.N. was age sixteen, K.N. was age thirteen, and A.N. was age ten. L.I. said that, in 2018, she lived with Brenda Lindsey, a family friend whom she called "Mamaw." L.I. related that in July 2018, she went to stay with Ms. Barison

---

[2] The indictment alleged that the offenses occurred between July 28, 2018, and August 10, 2018. However, the bill of particulars alleged that the offenses occurred between July 30, 2018, and August 6, 2018. For clarity, we will refer to the dates in the later-filed bill of particulars.

[3] We will refer to the minor victims by their initials.

[4] The indictment identified the following minor victims regarding each count: Count 2 (L.I., M.N., K.N.); Count 3 (L.I.); Count 4 (K.N.); Count 5 (K.N.); Count 6 (A.N.); and Count 7 (A.N.).

and to see her cousins. L.I. said that while Ms. Barison was away from the house, the Defendant and Ms. Rudd came to the house and offered the four girls food. L.I. said that because the four girls were hungry, they left the house with the Defendant and Ms. Rudd. Other evidence reflects that the Defendant was a family acquaintance who would babysit the cousins. L.I. said that after stopping to buy food at a grocery store, they went to the Defendant's house. L.I. stated that after eating, she and her cousins watched a movie. Ms. Rudd called for L.I. to come to the bathroom, where Ms. Rudd was preparing a bath for L.I. L.I. stated that while she took a bath, Ms. Rudd began to shave L.I.'s vagina and that the Defendant came into the bathroom several times. L.I. recalled that Ms. Rudd told her that "this is what's gonna make it better." L.I. said she was age ten at the time and felt "very scared." L.I. acknowledged that she did not tell her cousins what had happened in the bathroom because the Defendant told her that if she "ever told anybody, we would get in trouble, he would kill me."

L.I. testified that later that evening, the Defendant and Ms. Rudd called L.I. to their bedroom and asked her to lie on the bed. L.I. said that the Defendant tied L.I.'s arms to the bed with a cord and took off L.I.'s clothes, despite her saying "no." L.I. stated that the Defendant inserted his penis into her vagina and that she told the Defendant that it hurt. L.I. said that Ms. Rudd, the only other person in the room, sat on the bed watching. L.I. stated that the Defendant said, "[Y]ou know it feels good," and that he continued to "do it" for approximately fifteen minutes despite her requests for him to stop. L.I. said that when the Defendant stopped, she got dressed and went to the bathroom, where she noticed vaginal bleeding. She said that she did not tell anyone about the bleeding because she "was scared."

L.I. testified that while at the house, the Defendant and Ms. Rudd called L.I. and M.N. to the bedroom and forced L.I. and M.N. to watch the Defendant and Ms. Rudd have sexual intercourse. L.I. recalled that she and M.N. were "shaking," that the Defendant and Ms. Rudd were naked, and that if she and M.N. looked away, the Defendant "would like jerk our heads back to look at them have sex." L.I. stated that the Defendant said not to tell anyone what they were doing or "we're gonna all get in trouble, it won't be good." L.I. said that during this incident, the Defendant inserted a "dildo" (sex toy) into Ms. Rudd. L.I. said that she and M.N. could not leave the bedroom because the door was locked. L.I. stated that the Defendant's young children were also in the bedroom in a playpen.

L.I. testified that another time while she was at the Defendant's house, the Defendant "started licking my vagina and stuff." L.I. said that Ms. Rudd watched and "was playing with my boobs and she bit my boob . . . she kept touching them." L.I.

- 3 -

recalled that she told the Defendant that it did not feel good. L.I. said that while at the Defendant's house, she also witnessed the Defendant "st[i]ck his finger in [his] . . . baby's butt," when he was changing the baby's diaper and that "the baby began to scream a painful scream[.]" L.I. said that incident made her feel "very scared" and that, as a result, she began changing the baby's diaper.

L.I. testified that she and her cousins asked "multiple times if we could go back [to Ms. Barison's house], and [the Defendant and Ms. Rudd] kept saying no." L.I. said that neither she nor her cousins had a cell phone at the Defendant's house and that she believed she was at the Defendant's house for about a week before she and her cousins were returned to Ms. Barison's house. L.I. said that when she returned to Ms. Barison's house, L.I. sent a text message asking Ms. Lindsey to come and get her. L.I. acknowledged that she did not tell Ms. Lindsey about the abuse but that, the next day, Ms. Lindsey noticed a mark on L.I.'s breast. L.I. said that she initially made up an excuse but eventually said that the Defendant had forced the girls to watch the Defendant and Ms. Rudd have sexual intercourse. L.I. said that she did not tell Ms. Lindsey about all the events at the Defendant's house because she "was scared he was gonna hurt me or hurt my cousins, or I would get in trouble."

L.I. testified that she did not discuss everything that happened to her and her cousins at her forensic interview because she was "still scared" and not comfortable talking about it. L.I. said that the interview was approximately one month after the abuse and that it took her six or seven months before she felt "safe telling anybody what had actually happened." L.I. said that she was age ten when she was interviewed and that she often wrote words like "sex" instead of saying them. L.I. recalled that talking about sex at the interview scared her and made her "shake." L.I. acknowledged that she had been diagnosed with post-traumatic stress disorder (PTSD), depression, and anxiety and that she had panic attacks. L.I. confirmed that she never spied on the Defendant and Ms. Rudd in their bedroom or wanted to be in the bedroom with them.

On cross-examination, L.I. testified that she and her cousins went with the Defendant and Ms. Rudd because there was no food at Ms. Barison's house. L.I. confirmed that she and her cousins stayed a week at the Defendant's house. L.I. acknowledged that in her forensic interview, she did not relate everything that happened at the Defendant's house and that she "made up something about [the girls] playing hide and seek and [the Defendant's] touching [her] butt" over her jeans. L.I. said that she first disclosed everything that happened at the Defendant's house to her foster mother, which included allegations not disclosed in her forensic interview. L.I. said that her foster parents related the new allegations to the Department of Children's Services (DCS) but

- 4 -

that she could not recall whether DCS conducted an additional forensic interview with her. L.I. stated that K.N. and A.N. were on the couch and were aware that the Defendant and Ms. Rudd called L.I. to their bedroom. On redirect examination, L.I. acknowledged that she had been through "multiple" forensic interviews for "multiple reasons" unrelated to this case.

M.N. testified that she was currently age sixteen, that she considered Ms. Barison to be her mother, and that K.N. and A.N. were her sisters. M.N. said that she lived with her sisters, Ms. Barison, Ms. Barison's boyfriend, and Ms. Barison's brother. M.N. recalled that L.I. came to visit when Ms. Barison and her boyfriend were arguing and that Ms. Rudd took M.N. and L.I. to the Defendant's house for a couple of hours before returning them to Ms. Barison's house. M.N. said that, another time, the Defendant took her and L.I. to his house and that K.N. and A.N. were already there. M.N. said that she did not know how A.N. came to be there. M.N. confirmed that she never saw the Defendant abuse any of her sisters and that he did not "do anything" with her. M.N. stated that she saw the Defendant naked and having sex with Ms. Rudd in front of her and L.I. in the Defendant's bedroom. M.N. said that she could not recall why she and L.I. were in the bedroom. M.N. recalled that the Defendant placed a pillow over his baby's face when the baby cried while the Defendant and Ms. Rudd were having sex. M.N. said the baby was in a small crib next to the bed. M.N. stated that she feared the Defendant and that what he did to the baby scared her.

M.N. testified that while at the Defendant's house, Ms. Rudd asked the girls to play truth or dare in the living room, during which Ms. Rudd wore only thong underwear and the Defendant was naked. M.N. said that she did not want to play the game. M.N. said that K.N. was in another room with her friend during the game. M.N. stated that while she, L.I., and her sisters were at the Defendant's house, she often saw the Defendant and Ms. Rudd having sex, including in their bedroom, in the living room, and while they were playing truth or dare. M.N. said she was ten or eleven years of age in the summer of 2018, that she did not want to watch the Defendant and Ms. Rudd have sex, and that watching them made her feel disgusted and scared. M.N. said that the Defendant made her watch because "he wanted us to learn" and that he would lock the bedroom door and not allow her to leave. M.N. did not recall that A.N. was ever in the bedroom with her but recalled a time when M.N., L.I., and K.N. were in the bedroom, sitting on the end of the bed, while the Defendant and Ms. Rudd were on the bed, and the Defendant asked L.I. to "show her boobs." M.N. stated that L.I. did not want to do that. M.N. said that she slept on the couch but did not remember where the other girls slept. M.N. said that when she tried to leave, the Defendant said, "His house, his rules," and

that he would "kill us if we told on him." M.N. recalled seeing the Defendant "yell at" Ms. Rudd and "grab[] [Ms. Rudd's] neck."

M.N. testified that she could not remember everything that had happened at the Defendant's house or the dates she was there. M.N. said that she could not recall how she got back to Ms. Barison's house but remembered that she was at the Defendant's house for "the week." M.N. said Ms. Barison's house was "chaotic" because Ms. Barison and her boyfriend often argued and because Ms. Barison used drugs. M.N. acknowledged that, initially, she did not tell anyone about everything that happened at the Defendant's house because she was scared that she would be taken from Ms. Barison. M.N. said that she remembered having a forensic interview and that she did not tell the whole truth.

On cross-examination, M.N. testified that she went to the Defendant's house twice. M.N. said that, initially, Ms. Rudd drove her to the Defendant's house and that, later, the Defendant drove her. M.N. said that K.N. had been at the Defendant's house for three days before M.N. and the other girls arrived and that she and L.I. were together the entire time they were at the Defendant's house. M.N. acknowledged that she lied in her forensic interview when she said that no one told her and L.I. to come into the bedroom and when she said that L.I. wanted to watch. On redirect examination, M.N. confirmed that she had tried to forget what happened at the Defendant's house.

A.N. testified that she was currently age eleven, that M.N. and K.N. were her sisters, that L.I. was her cousin, and that she currently lived with Ms. Barison. A.N. said that she had been to the Defendant's house with M.N., L.I., and K.N. on more than one occasion. A.N. said that five years ago she stayed at the Defendant's house for approximately one week. She recalled that she was in kindergarten but could not remember a specific date. A.N. stated that a woman, whose name she could not remember, shared a bedroom with the Defendant and that the woman and the Defendant had two children, who were ages one and three. A.N. stated that, on one occasion while she was at the Defendant's house, he "touched [her] privates." A.N. indicated on a diagram that the Defendant touched her vagina. A.N. said that she did not recall being interviewed about the incident or talking to anyone about it and that she did not presently want to talk about it.

A.N. testified that she used to refer to a vagina as a "monkey" and to buttocks as "a bubble." A.N. was shown a diagram of the front and back of a girl's naked body with "monkey" and "bubble" notations and red circles on it. A.N. testified that she did not recognize the diagram. When the State asked A.N. if she drew on the diagram, A.N.

responded that she remembered drawing on the diagram during the forensic interview. The diagram was received as an exhibit. A.N. said that she had drawn a red circle around the girl's vagina on the diagram. A.N. stated that she remembered telling the interviewer that it hurt when the Defendant touched her vagina. A.N. explained that she wore shorts and slept on a loveseat in the living room when she awoke to feel the Defendant touch her skin under her shorts. A.N. said that the Defendant's touching her made her uncomfortable. A.N. said she did not remember the Defendant's touching her bottom and acknowledged that she lied during the forensic interview when she said the Defendant touched her bottom. A.N. stated that she was testifying at the trial "[b]ecause y'all made me."

On cross-examination, A.N. testified that, while at the Defendant's house, she primarily "hung out" with the Defendant's three-year-old daughter. A.N. said that she talked to Ms. Barison and the forensic interviewer about being touched by the Defendant. A.N. acknowledged that she lied during her interview when she said that she had never seen a "grownup's privates." A.N. said that the Defendant never told her not to tell anyone and that he gave "presents" to K.N. and M.N. On redirect examination, A.N. said that the Defendant gave K.N. and M.N. makeup and that she did not want the Defendant to touch her vagina.

K.N. testified that, in 2018, she went to the Defendant's house with M.N., A.N., and L.I. when she was between second and third grade. K.N. said that she lived with Ms. Barison, whom she called "Mom," her sisters, and other individuals. K.N. said that the Defendant, Ms. Rudd, and their children used to visit Ms. Barison's house. K.N. recalled that she had been to the Defendant's house often with A.N., M.N., and L.I. K.N. said that L.I. primarily stayed with Ms. Barison during the summer of 2018 and that the Defendant was their babysitter. K.N. said that there was a time when she was at the Defendant's house with M.N., A.N., and L.I., during which the Defendant touched her. K.N. stated that many times when she was at the Defendant's house, the Defendant would "put us in a room and make us watch [Ms. Rudd] and him have sex." K.N. said that sometimes her friend, who lived at the Defendant's house, would be with K.N., M.N., and L.I. in the bedroom but that A.N. was not there. K.N. confirmed that she did not want to be in the bedroom with the Defendant and Ms. Rudd. K.N. stated that the Defendant told her, "What goes on in the house has to stay in the house," and "[I]f we tell anyone, it would be bad for us." K.N. said she understood the Defendant to mean that he would hurt them.

K.N. testified that she would go to sleep on the couch and wake up in the Defendant's bed when he "would put his fingers inside of me." K.N. clarified that the

- 7 -

Defendant placed his fingers in her vagina, that it hurt her, and that it happened "a lot." K.N. said that during those events, the other girls were asleep in the living room and that Ms. Rudd was asleep in the Defendant's bed. K.N. stated that she recalled a time when Ms. Rudd taught her, L.I., and M.N. how to shave their vaginal areas. K.N. said that the Defendant would "make" Ms. Rudd have sex with him even though Ms. Rudd was unwilling. K.N. recalled that when the Defendant's young children cried, the Defendant "put a pillow over their face," which made her think the Defendant was "gonna hurt the baby." K.N. said that she told L.I. and M.N. about the Defendant touching her and that she was interviewed about it. K.N. said that, at one point, the girls had to spend the night at the DCS office. K.N. acknowledged that she did not tell the forensic interviewer everything that happened at the Defendant's house because she was afraid she would be taken from Ms. Barison and because the Defendant told her if she "told anyone, it would be bad."

On cross-examination, K.N. testified that the Defendant touched her bottom approximately ninety percent of the time he babysat K.N. and the other girls. K.N. said that Ms. Barison met the Defendant through a mutual friend and, afterward, the Defendant began babysitting for Ms. Barison. K.N. said that she, L.I., M.N., and A.N. had "sometimes" gone to the Defendant's house before the summer of 2018. K.N. said that she saw the Defendant and Ms. Rudd have sex two weeks after the Defendant began babysitting her and that she also saw them have sex during the July 30, 2018 week. K.N. said that she was dishonest in her forensic interview when she said that the Defendant "only touched the outside of [her] vagina." K.N. said that she also lied in her interview when she said that L.I. wanted to watch the Defendant and Ms. Rudd have sex. On redirect examination, K.N. explained that the Defendant often touched and rubbed the skin of her bottom with his hand when she was lying on the couch at his house, that she did not want him to do it, and that she was not completely honest with the forensic interviewer because she feared the Defendant.

Ms. Rudd testified that she was age thirty, had been in a "rocky" relationship with the Defendant in the summer of 2018, and had two children with the Defendant. Ms. Rudd described her relationship with the Defendant as one that revolved around drugs. Ms. Rudd said that her parents adopted her two children and that she was not allowed to visit them. Ms. Rudd said that she feared the Defendant because he threatened to kill her and their children and that he had choked her. Ms. Rudd also noted that the Defendant told her to deny that anything happened with "the girls." Ms. Rudd said that she was not employed while she lived with the Defendant.

- 8 -

Ms. Rudd testified that L.I., A.N., K.N., and M.N. spent time at the Defendant's house. Ms. Rudd confirmed that she had difficulty remembering events because of past substance use, although she had not used drugs for four years. She said that she previously had used methamphetamines, oxycodone, Roxicodone, and Suboxone and that she used those substances in front of the girls. Ms. Rudd recalled that "while [the girls] were all in the [bed]room," she and the Defendant were "doing stuff with each other naked." Ms. Rudd explained in more detail that she and the Defendant used a sex toy on each other and that she performed fellatio on the Defendant. Ms. Rudd specifically recalled engaging in this conduct when L.I. was present. Ms. Rudd did not recall showing the girls how to shave their pubic areas but said that she "would believe it" if the girls said she did. Ms. Rudd remembered that the Defendant had carried K.N. to the bedroom and unbuttoned her pants, but Ms. Rudd could not remember more about the incident. Ms. Rudd confirmed that she was arrested for a violation of probation but refused to leave jail when the Defendant offered to post bail for her release because she feared him. Ms. Rudd said that after being arrested for the charges in this case, she lost custody of her children, entered into a plea agreement, and was placed on the sex offender registry.

On cross-examination, Ms. Rudd testified that she recalled having sex with the Defendant in front of L.I., M.N., K.N., and A.N., and her children but could not recall a specific date. On redirect examination, Ms. Rudd clarified that she was "sure" about having sex in front of "the girls" and that, on one occasion, the Defendant "had his d--- between our daughter's legs."

After Ms. Rudd's testimony regarding the Defendant and their daughter, the defense moved for a mistrial, and a bench conference was held. The trial court denied the motion and instructed the jury to disregard Ms. Rudd's statement regarding her daughter and not to consider it for any reason.

Bobbie Womack, who had performed forensic interviews for the Campbell County Children's Center, testified as an expert in forensic interviews. Ms. Womack said the goal of a forensic interview was to provide a safe environment where a child can disclose abuse. Ms. Womack explained that a forensic interview was not an interrogation and that a child might or might not provide every detail when answering questions. Ms. Womack stated that a child might not want to disclose information due to the child's concern for safety or for being removed from his or her home. According to Ms. Womack, "Safety is a huge factor in children disclosing child abuse." Ms. Womack acknowledged that it was common for children to disclose additional details later in time, often after they have received therapy or have been removed from the unsafe situation. Ms. Womack

explained that the term "nonactive disclosure" described the stage at which a victim was not ready to disclose information. Ms. Womack stated that it was normal for a child not to disclose abuse immediately after it occurred and for a child to receive gifts from an abuser to convince the child not to disclose the abuse. Ms. Womack also explained that "active disclosure" described the stage when a victim was ready to disclose information.

Ms. Womack testified that, on August 15, 2018, she conducted separate forensic interviews of L.I., M.N., K.N., and A.N. Ms. Womack said that she gave the children an opportunity to write words that were too difficult to say during the interview and that L.I. wrote the word "sex." Ms. Womack identified a diagram used during her forensic interview of the victims on which Ms. Womack had written the words "monkey" and "bubble." Ms. Womak stated that A.N. used those terms when referring to her vagina and buttocks. Ms. Womack said that she would not be surprised if, at the trial, the girls remembered the abuse in more detail than during their 2018 interviews or if the girls admitted to lying about certain facts.

The trial court dismissed Count 7, charging aggravated sexual battery of A.N., at the close of the State's proof.

The Defendant elected not to testify.

The State elected to proceed on Count 2, charging solicitation of sexual exploitation of a minor, with the allegation that L.I. viewed the Defendant using a sex toy on Ms. Rudd and on Count 6, charging aggravated sexual battery of A.N., with the allegation that the Defendant touched A.N.'s vagina when she was on the couch. The State requested a modified unanimity instruction for generic evidence as to Counts 3, 4, and 5, charging aggravated sexual battery of L.I. (Count 3) and K.N. (Counts 4 and 5).

The jury convicted the Defendant of one count of soliciting sexual exploitation of a minor under thirteen years of age regarding L.I., one count of aggravated sexual battery of L.I., two counts of aggravated sexual battery of K.N., and one count of aggravated sexual battery of A.N.

# I

## Bill of Particulars and Trial Evidence Variance

The Defendant contends that he did not receive a fair trial because he was prejudicially surprised when the allegations in the indictment and bill of particulars were

materially different from the allegations presented at the trial.[5]  The Defendant directs his argument to the alleged acts of abuse.  The State counters that the Defendant is not entitled to relief because no fatal variance existed between the charges in the indictment and bill of particulars and the trial evidence.

An individual accused of a crime has the right to be informed of the nature and cause of an accusation against him.  U.S. Const. amends. XI, XIV; Tenn. Const. art. 1, § 9.  Pursuant to Tennessee Code Annotated section 40-13-202 (2025), an indictment "must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition," and in such a manner "as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment."

Our supreme court has said that an indictment is sufficient if it provides adequate information to enable the defendant to know the accusation against which he must defend, furnishes the trial court with an adequate basis for entry of a proper judgment, and protects the defendant from double jeopardy.  *See State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000).  Our supreme court has also noted that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000).  In this regard, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense."  *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000).

Tennessee Criminal Procedure Rule 7(c) provides that a defendant may request a bill of particulars "so as to adequately identify the offense charged."  A bill of particulars "provide[s] the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citations omitted).  "A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *Id*. (citations omitted).  "A material variance occurs only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging

---

[5] Although the Defendant discussed Count 7, charging aggravated sexual battery of A.N., in his brief, we will not address it as the count was dismissed by the trial court.

instrument." *Id.* "[A] material variance will not be found where the allegations and proof substantially correspond." *State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996) (citation omitted). A variance is prejudicial if the indictment fails to sufficiently inform a defendant of the charges against him, causes him to be misled or surprised at trial, and presents a danger that he may be prosecuted a second time for the same offense. *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). Furthermore, our supreme court has recognized that "young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or provide extensive details in this regard." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999).

*Count 2: Soliciting Sexual Exploitation of a Minor*

Count 2 charged the Defendant with soliciting sexual exploitation of a minor. The State submitted an election to proceed in Count 2 with the allegation that L.I. viewed the Defendant use a sex toy on Ms. Rudd. The indictment and bill of particulars alleged that L.I. was exposed to the Defendant and Ms. Rudd engaging in sexual intercourse in the Defendant's bedroom and identified Tennessee Code Annotated section 39-13-529(b)(1), which, in relevant part, makes it

> unlawful for any person eighteen (18) years of age or older, directly or by means of electronic communication . . . to intentionally:
>
> > (1) Engage in . . . sexual activity for the purpose of having the minor view the . . . sexual activity, including circumstances where the minor is in the presence of the person . . . .

"Sexual activity" is defined, in relevant part, as including "[v]aginal, anal or oral intercourse . . . done with another person" or "[t]he insertion of . . . any object into another person's anus or vagina[.]" *Id.* § 39-13-529(d)(4)(A), (E).

At the trial, L.I. testified that she was forced to watch the Defendant and Ms. Rudd engage in sexual conduct, which included the Defendant using a sex toy on Ms. Rudd. Ms. Rudd testified that L.I. watched Ms. Rudd and the Defendant use a sex toy on each other and watched Ms. Rudd perform fellatio on the Defendant. The sexual acts described by the witnesses fall within the statutory definition of sexual activity. We conclude that no material variance existed between the indictment and the trial proof, that the Defendant was sufficiently apprised of the charge against him, and that the proof at

trial substantially corresponded to the indictment. The Defendant is not entitled to relief on this basis.

*Counts 3 through 6: Aggravated Sexual Battery*

Counts 3, 4, 5, and 6 charged the Defendant with aggravated sexual battery. Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] the victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). Sexual contact, in relevant part, is

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

*Id.* § 39-13-501(6) (2025). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* at (2).

Regarding Count 3, the indictment and the bill of particulars alleged that the Defendant committed aggravated sexual battery when he touched L.I.'s buttocks during a game of hide and seek. At the trial, L.I. testified that she was tied down when the Defendant inserted his penis into her vagina and that, on another occasion, the Defendant touched her vagina with his tongue. The Defendant argues that the trial proof was materially different than the allegations in the indictment and bill of particulars and that he was prejudiced by this variance. The State contends that the Defendant was on notice that the allegations against him regarded "sexual contact" with L.I. The State relies on our decision in *State v. Jones*, in which the defendant was indicted for rape by sexually penetrating the female victim "by fellatio," although the trial proof established that, instead of fellatio, the defendant performed cunnilingus on the victim. 953 S.W.2d at 700. The *Jones* court reasoned that the indictment's specification that the rape occurred "by fellatio" was unnecessary surplusage because the indictment otherwise sufficiently apprised the defendant of the offense charged. The court noted that the "sexual penetration" element of the charged offense of rape was statutorily defined as "sexual intercourse, cunnilingus, fellatio." *Id.* (citing T.C.A. § 39-13-503 (Supp. 1995) (subsequently amended)). Thus, the *Jones* court held that no material variance existed.

- 13 -

Similarly, in this case, aggravated sexual battery prohibits "sexual contact," which is defined as the intentional touching of the victim's or the defendant's "intimate parts," including touching the clothing covering the victim's "intimate parts." T.C.A. § 39-13-501(6). "Intimate parts" includes "the primary genital area, groin, inner thigh, buttock or breast[.]" *Id.* § 39-13-501(2). Although the indictment alleged that the Defendant "touch[ed] the victim's buttocks," L.I. testified that the Defendant orally touched her vagina. Both acts involved the Defendant's touching L.I.'s "intimate parts," fall within the statutory definition of the prohibited sexual contact, and are the type of contact that could be anticipated within that statutory definition. We also note that the State did not charge the Defendant with rape of a child and, instead, charged the Defendant with the lesser-included offense of aggravated sexual battery. *See State v. Howard*, 504 S.W.3d 260, 273-75 (Tenn. 2016). We conclude that a material variance did not exist, that the Defendant was sufficiently apprised of the charge against him, and that the proof at trial substantially corresponded to the indictment. *See State v. Osborne*, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007) ("When the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material.") (citation omitted).

The Defendant also argues that he was deprived of a fair trial by the State's nondisclosure of the additional allegations of abuse that L.I.'s foster parents reported to DCS. The incident L.I. described at the trial, and upon which the State relied to support Count 3, was part of the additional, undisclosed allegations and was not mentioned in L.I.'s earlier forensic interview. As we have concluded, no material variance existed between the indictment's allegations and the trial proof. The Defendant is not entitled to relief on this basis.

Regarding Count 4, the indictment and bill of particulars alleged that the Defendant committed aggravated sexual battery by touching K.N.'s primary genital area and that this contact occurred while K.N. was sleeping or acting as if she were asleep on the couch. At the trial, K.N. testified that she fell asleep on the couch and awoke to find the Defendant penetrating her vagina with his fingers. We conclude that there was no material variance between the indictment and the trial proof, that the Defendant was sufficiently apprised of the charge against him, and that the proof at trial substantially corresponded to the indictment. The Defendant is not entitled to relief on this basis.

- 14 -

Regarding Count 5, the indictment and bill of particulars alleged that the Defendant committed aggravated sexual battery by touching K.N.'s buttocks and that this contact occurred while K.N. was sleeping or acting as if she were asleep on the couch. At the trial, K.N. testified that the Defendant touched her buttocks while she was lying on the couch. We conclude that there was no material variance between the indictment and the trial proof, that the Defendant was sufficiently apprised of the charge against him, and that the proof at trial substantially corresponded to the indictment. The Defendant is not entitled to relief on this basis.

Regarding Count 6, the indictment and bill of particulars alleged that the Defendant committed aggravated sexual battery by touching A.N.'s primary genital area while she was on the couch. At the trial, A.N. testified that she awoke to feel the Defendant touch her vagina and that she indicated during her forensic interview that the Defendant had touched her vagina and it "hurt." We conclude that there was no material variance between the indictment and the trial proof, that the Defendant was sufficiently apprised of the charge against him, and that the proof at trial substantially corresponded to the indictment. The Defendant is not entitled to relief on this basis.

## II

## Severance at Trial

The Defendant contends that the trial court erred by failing to sever the offenses after L.I.'s testimony at the trial. Specifically, the Defendant argues that the offenses in this case were permissively joined, that trial testimony revealed allegations not previously known to him, and that the new allegations provided a basis for a severance pursuant to Rule 14(a)(1) of the Tennessee Rules of Criminal Procedure. The State counters that the court denied the Defendant's pretrial motion to sever, concluding that his motion filed the day before trial was untimely, and that the offenses were subject to mandatory joinder pursuant to Tennessee Criminal Procedure Rule 8(a). The State contends that the Defendant has waived appellate review of this issue by failing to move for a severance during the trial, and, alternatively, that the Defendant has failed to demonstrate that the court abused its discretion by denying his pretrial severance motion.

The day before the trial, the Defendant filed a motion to sever the offenses. The trial court denied the motion as being untimely. According to the court, "I'm going to deny the motion. It sounds like a mandatory joinder case, but you probably need to object as we go through the trial." At the pretrial hearing, the court also noted that the

- 15 -

State had no opportunity to respond and to present proof in response to the Defendant's motion because the motion was "filed a couple of hours ago."

The Defendant did not request a severance during the trial. After the trial, the Defendant filed a motion for new trial and claimed that the court erred by failing to sever the offenses after L.I.'s testimony. During the motion for new trial hearing, the court addressed the severance issue by concluding, "it was just very clear that everything arose out of the same incident, the same victims were involved in various parts of everything, there was just really no way to separate those issues." The court denied the motion for new trial.

Tennessee Criminal Procedure Rule 8(a) states that

> [t]wo or more offenses shall be joined in the same indictment . . . with each offense stated in a separate count . . . if the offenses are: (A) based on the same conduct or arise from the same criminal episode; (B) within the jurisdiction of a single court; and (C) known to the appropriate prosecuting official at the time of the return of the indictment[.]

Our supreme court has established a two-part analysis for determining if offenses arise from the same "criminal episode." *See State v. Johnson*, 342 S.W.3d 468, 474-75 (Tenn. 2011); *see also State v. Roy Lee Ellis*, No. W2017-00699-CCA-R3-CD, 2018 WL 673387, at *6, (Tenn. Crim. App. Jan. 31, 2018). First, the acts "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Johnson*, 342 S.W.3d at 475. Second, "the proof of one offense must be 'inextricably connected' with the proof of the other or . . . the proof of one offense forms a 'substantial portion of the proof' of the other offense." *Id.* (citation omitted).

Permitting or denying a motion to sever is within the discretion of the trial court. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *see State v. Coleman*, 619 S.W.2d 112, 116 (Tenn. 1981). This court reviews a trial court's decision to grant or to deny a motion to sever for an abuse of discretion. *State v. Eady*, 685 S.W.3d 689, 709 (Tenn. 2024); *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Harmon v. Hickman Comm. Healthcare Svcs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020) (quoting *Lee Med., Inc. v. Butler,* 312 S.W.3d 515, 524 (Tenn. 2010)); *see Eady*, 685 S.W.3d at 709.

Tennessee Criminal Procedure Rule 14(a) provides that "[a] defendant waives severance if the motion is not timely."

Here, the record reflects that the trial court determined at the pretrial hearing that the Defendant's severance motion, filed the day before the trial, was untimely and that the offenses were subject to mandatory joinder. The court, again, stated at the motion for new trial hearing that the offenses were subject to mandatory joinder. Although the court did not use the term "same criminal episode" when discussing the issue of joinder at the motion for new trial hearing, the court found that "everything arose out of the same incident, the same victims were involved in various parts of everything, [and] there was just really no way to separate those issues."

The record supports the trial court's determination that the offenses occurred during the same criminal episode and were subject to mandatory joinder. The offenses were within the jurisdiction of the Union County Criminal Court, and the offenses were charged together in the indictment, having arisen from the victims' week-long stay at the Defendant's house. The facts regarding the Defendant's sexual contacts with and his abuse of the victims occurred during the same week while the victims were together at the Defendant's house, and the proof of the offenses included the same victims, defendant, place, time, circumstances, and corroborating testimony. Each victim testified that the abuse occurred at the Defendant's house, that the Defendant was their caregiver at the time, and that Ms. Rudd and the Defendant's two young children were present. L.I., M.N., and K.N. testified that the Defendant and Ms. Rudd engaged in sexual activity in the presence of L.I., M.N., and K.N. L.I. and M.N. testified that they were forced to watch the Defendant use a sex toy on Ms. Rudd. Ms. Rudd corroborated this testimony. L.I., K.N., and Ms. Rudd testified that Ms. Rudd either shaved or showed L.I., M.N., and K.N. how to shave their pubic areas, in order to prepare them for sexual contact with the Defendant. Ms. Rudd testified that the Defendant carried K.N. into his bedroom and unbuttoned her pants. Ms. Rudd, L.I., M.N., and K.N. testified that the Defendant threatened them if they disclosed the abuse. L.I. testified that K.N. and A.N. were aware that L.I. was in the Defendant's bedroom while the Defendant and Ms. Rudd engaged in sexual activity. Each victim testified to specific instances of abuse, often witnessed by other victims or Ms. Rudd. Several victims testified to sleeping on furniture in the Defendant's living room at night, corroborating testimony by K.N. and A.N. Accordingly, we conclude that the court did not abuse its discretion by denying a severance of the offenses.

In cases of mandatory joinder, the trial court retains discretion to sever under Tennessee Criminal Procedure Rule 14(b) if "severance is necessary to achieve a fair

determination of the defendant's guilt or innocence of each offense."  The record, however, reflects that while severance was denied pretrial, the Defendant did not raise the issue of severance after L.I.'s testimony at the trial, and the trial court did not sua sponte indicate that a severance was necessary to achieve a fair determination after her testimony.  Upon review, we conclude that the Defendant has waived appellate review of this claim by failing to request a severance during the trial.  *See* Tenn. R. Crim. P. 14(a)(1)(A) (A defendant waives severance if the motion is not timely.); *see also Spicer v. State*, 12 S.W.3d 438, 443 (Tenn. 2000) ("Unless the defendant moves to sever the offenses prior to trial or at an otherwise appropriate time, the defendant waives the right to seek separate trials of multiple offenses.").  Furthermore, we note that the Defendant did not request plain error review.  The Defendant is not entitled to relief on this basis.

## III

## Sufficiency of the Evidence Regarding Count 6

The Defendant argues that the evidence is insufficient to support his conviction in Count 6 for aggravated sexual battery because the victim, A.N., did not provide evidence of the timeframe of the alleged sexual contact.  Count 6 alleged that the Defendant touched A.N.'s vagina at his house on or about July 30, 2018, through August 6, 2018. The State counters that the evidence was sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence.  *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two."  *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.

- 18 -

2009)). Our supreme court has "recognized that in most child sexual abuse cases the state is unable to offer the specific date when an alleged offense occurred." *State v. Campbell*, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995) (citation omitted). In such cases, a conviction can be affirmed if the defense was not "hampered by the lack of specificity." *State v. Byrd*, 820 S.W.2d 739, 742 (Tenn. 1991).

The bill of particulars identifies the timeframe for Count 6 as July 30, 2018, through August 6, 2018. A.N. testified that she was age six at the time of the alleged sexual contact, that she recalled being at the Defendant's house in 2018 when it was warm, and that she stayed for "maybe a week." She testified that her sisters were with her at the Defendant's house, that a woman, who lived in the Defendant's bedroom, was there, that the Defendant's two children were there, and that the Defendant touched her "private" while she was there. A.N. also recalled that she slept on a "loveseat" while K.N. slept on a recliner and that she awoke when the Defendant touched her vagina. K.N. testified that she went to the Defendant's house in the summer of 2018 with her sisters, M.N. and A.N., and her cousin, L.I., between July 27, 2018, and August 10, 2018. L.I. testified that she went to the Defendant's house in July 2018 and that her cousins, K.N., M.N., and A.N., were with her. Ms. Rudd recalled that during 2018, L.I., M.N., K.N., and A.N. spent time with her and the Defendant at the Defendant's house. Viewing this evidence in the light most favorable to the State, a rational jury could conclude beyond a reasonable doubt that between July 30, 2018, and August 6, 2018, A.N. stayed at the Defendant's house with L.I. and A.N.'s sisters, where she awoke from sleeping on the loveseat to find the Defendant touching her vagina. The evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this issue.

## IV

## Lack of Unanimous Verdict for Count 3

The Defendant contends that he did not receive a unanimous verdict in Count 3, which alleged aggravated sexual battery, because L.I. testified to specific acts of abuse, requiring the State to elect a specific offense to ensure a unanimous verdict. The State counters that the Defendant has waived this claim by failing to request that the State make an election during the trial. The State also argues that the Defendant is precluded from plain error review because the Defendant did not request it. The Defendant did not reply to the State's arguments.

- 19 -

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g. State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993). "Our cases have not required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged." *State v. Adams*, 24 S.W.3d 289, 297 (Tenn. 2000) (citations omitted); *see State v. Charles D. Perry*, No. M2022-00643-CCA-R3-CD, 2023 WL 6150852, at *8 (Tenn. Crim. App. Sept. 21, 2023). "[A]pplying the election doctrine in child sexual abuse cases presents practical difficulties" when victims are unable to "identify specifically when each alleged act occurred" and, instead, testify to generic evidence of abuse. *State v. Qualls*, 482 S.W.3d 1, 10-12 (Tenn. 2016). Accordingly, "in generic evidence cases the prosecution need not elect a specific criminal act or incident as the basis of a conviction for each charge." *Id.* at 17. In generic evidence cases, "the election doctrine may be satisfied . . . by the trial court providing a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim." *Id.* "[T]he trial court must determine at the conclusion of the State's case-in-chief whether the proof is sufficiently specific as to apply the strict election requirement or whether the election requirement may be satisfied by giving the modified unanimity instruction." *Id.* (citation omitted).

Here, the State charged the Defendant with aggravated sexual battery of L.I. in Count 3. L.I. testified that the Defendant penetrated her vagina with his penis and, on another occasion, performed cunnilingus on her. The State elected to rely on generic evidence. The trial court gave the following modified unanimity instruction:

> The State has offered proof in its case in chief of more than one act allegedly committed by the defendant which the State alleges constitutes an element of the offense of aggravated sexual battery as charged in count three of the indictment.

> To ensure a unanimous verdict, the State must prove beyond a reasonable doubt the commission of all the acts described by the alleged victim in that particular count as occurring within the time period charged

in that count of the indictment. Before you can find the defendant guilty, you must unanimously agree that the State has proven beyond a reasonable doubt the commission of all the acts described by the alleged victim as occurring within the time period charged in that count of the indictment.

*See* T.P.I. 42.25(a).

The State may proceed with generic evidence and a modified unanimity instruction in a child sexual abuse case when a victim is unable to identify when specific acts of abuse occurred. That is not the case here. L.I. recalled the week during which the abuse took place and recalled the acts of abuse with specificity. Our supreme court has held that "the trial court must determine at the conclusion of the State's case-in-chief whether the proof is sufficiently specific as to apply the strict election requirement or whether the election requirement may be satisfied by giving the modified unanimity instruction." *Qualls*, 482 S.W.3d at 17. Here, the court erred by failing to require the State to make an election of a specific offense as to Count 3. Although the State argues on appeal that the Defendant waived this claim by failing to request that the State make an election during the trial, the Defendant cannot waive the court's responsibility to ensure that the State makes a proper election.

Recognizing that all errors are not equal, our supreme court has established three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). Because the election doctrine touches on a defendant's constitutional rights, we will apply a non-structural constitutional harmless error analysis in this case. *See Qualls*, 482 S.W.3d at 18. "[A] non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." *Rodriguez*, 254 S.W.3d at 371 (citations omitted). When determining whether a non-structural constitutional error is harmless, we must consider "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. (citations omitted); *see Qualls*, 482 S.W.3d at 18 ("If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . [the appellate court] should not find the error harmless.").

Here, we are convinced beyond a reasonable doubt after examining the record that the lack of an election for specific conduct did not contribute to the verdict obtained and that the jury's verdict would have been the same had the jury been presented with only one specific event from L.I.'s testimony. L.I. described with specificity the type of sexual contacts that occurred, when they occurred, and where they occurred, which we have already determined to be consistent with the indictment and bill of particulars. The Defendant's guilt or innocence hinged on the jury's assessment of L.I.'s credibility regarding the sexual contact. *See Qualls*, 482 S.W.3d at 18. L.I.'s testimony was corroborated by Ms. Rudd's testimony that she shaved L.I.'s vaginal area to prepare L.I. for sexual contact with the Defendant. L.I.'s testimony was also corroborated by K.N.'s testimony that Ms. Rudd taught L.I., M.N., and K.N. how to shave their pubic areas. There was no dispute that L.I. was under thirteen years of age at the time of the offenses or that the Defendant had authority over L.I. and used that authority to accomplish the sexual contact. The Defendant was L.I.'s babysitter and, while at the Defendant's house, L.I. had no cell phone or opportunity to return to Ms. Barison's house. Additionally, the trial court explicitly discussed the need for juror unanimity in the jury instructions which required the jury to find beyond a reasonable doubt that the Defendant engaged in all the conduct alleged by the victim. *See* T.P.I. 42.25(a). Finally, the Defendant's defense was a "blanket denial" to any sexual battery. *See Qualls*, 482 S.W.3d at 19 (citing *cf. State v. Ducker*, 27 S.W.3d 889, 899-900 (Tenn. 2000) (holding that the error was harmless beyond a reasonable doubt, in part, because the defendant's defense was not inhibited by the error)). We conclude beyond a reasonable doubt that the jury's verdict would have been the same if the State had made an election for specific conduct rather than generic evidence.


V


**Mistrial**


The Defendant contends that the trial court erred by denying his motion for a mistrial after Ms. Rudd testified that the Defendant put his penis between their young daughter's legs. The Defendant noted that (1) the court had previously held such evidence to be inadmissible and (2) the evidence was substantially similar to the acts for which the Defendant was charged, making it unduly prejudicial. The State counters that the court did not abuse its discretion by denying a mistrial. Specifically, the State argues that Ms. Rudd's testimony was unsolicited, that the court promptly issued a curative instruction, and that the jury is presumed to have followed the court's instruction.

During a pretrial evidentiary hearing, Ms. Rudd testified that the Defendant put his exposed penis between their young daughter's legs and that Ms. Rudd was the only witness to that event. The trial court found this evidence was inadmissible pursuant to Tennessee Rule of Evidence 404(b). However, at the trial, Ms. Rudd repeated the allegation.

The following exchange occurred during the cross-examination of Ms. Rudd:

[Ms. Rudd]: . . . I'm sure that we had sex in front of them.

. . . .

[Defense Counsel]: . . . are you sure about your memory at that specific incident?

[Ms. Rudd]: No.

[Defense Counsel]: So you don't know, do you?

[Ms. Rudd]: No

The State then proceeded with the following questions on redirect examination:

[State]: Ms. Rudd, what don't you know about?

[Ms. Rudd]: What do you mean?

[State]: Well [defense counsel] just asked you, is there anything you might be sure about. And you said you were sure about having sex in front of the girls.

[Ms. Rudd]: And I'm sure he had his d--- between our daughter's legs.

The trial court sustained the Defendant's objection to Ms. Rudd's testimony, and the Defendant moved for a mistrial. After a bench conference addressing the Defendant's motion, the court denied the motion and instructed the jury to "disregard that last statement and . . . not consider it for any reason."

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). "The burden of establishing a manifest necessity lies with the party seeking the mistrial." *State v. King*, 703 S.W.738, 765 (Tenn. Crim. App. 2024) (citation omitted). This court has recognized that

> [i]n determining whether a trial court abused its discretion in denying a mistrial because of inappropriate testimony before the jury, this court should consider the following non-exclusive factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof."

*Id.* (quoting *State v. Nash*, 294, S.W.3d 541, 547 (Tenn. 2009) (citation omitted)).

Here, Ms. Rudd's testimony regarding her daughter was unsolicited, spontaneous, and not in direct response to the State's question. The trial court immediately instructed the jury to disregard the testimony and "not consider it for any reason." "[J]urors are presumed to follow the instructions of the trial court." *State v. Williams,* 977 S.W.2d 101, 106 (Tenn. 1998) (citing *State v. Cribbs,* 967 S.W.2d 773, 784 (Tenn. 1998); *State v. Laney,* 654 S.W.2d 383, 389 (Tenn.1983)). The Defendant does not argue that the court's curative instruction was inadequate, and testimony by the victims provided overwhelming proof of the conviction offenses. Accordingly, we conclude that the Defendant has failed to meet his burden of establishing a manifest necessity for a mistrial. The court did not abuse its discretion by denying the Defendant's motion for a mistrial. The Defendant is not entitled to relief on this basis.

## VI

### Rule 404(b) Objections

The Defendant contends that the trial court erred by denying his Tennessee Rule of Evidence 404(b) objections and by admitting (1) L.I.'s testimony that the Defendant inserted his finger in his baby's bottom when he was changing the baby's diaper and (2)

M.N.'s testimony that the Defendant choked Ms. Rudd. The State counters that the court did not abuse its discretion by admitting this evidence.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*. 404(b); *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); see *State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998). If the court did not substantially comply with the procedures outlined in Rule 404(b), our review is de novo. *Clark*, 452 S.W.3d at 287 (citations omitted).

Ms. Rudd testified, during the trial but outside the presence of the jury, that the Defendant choked her for "saying stuff" related to the sexual abuse charges and told her that he would kill her and their children if she "said anything." Ms. Rudd said that she had a scar on her neck from being choked by the Defendant but that she did not remember the Defendant's threatening the four girls. Ms. Rudd thought that the four girls were present at another time when the Defendant choked her. Ms. Rudd also recalled that the Defendant abused their young daughter by putting his exposed penis between the child's legs. On cross-examination, Ms. Rudd said that she was the only person who witnessed the Defendant putting his penis between their daughter's legs. Ms. Rudd acknowledged that she could not remember how many times the Defendant had threatened her.

Similarly, L.I. testified outside the presence of the jury that, on one occasion, she saw the Defendant "st[i]ck his finger in the [Defendant's] little baby's butt" when the Defendant was changing the baby's diaper. L.I. said that the baby "screamed like in pain" which made L.I. feel "scared." L.I. stated that she began changing the baby's diaper to prevent that from happening again.

The trial court ruled that Ms. Rudd's scar corroborated her testimony that the Defendant had choked her, that this evidence was material and relevant to show the Defendant's attempt to intimidate Ms. Rudd, and that this evidence, witnessed by the minor victims, was material and relevant to the minor victims' reluctance to fully report any abuse. The court concluded that the evidence of choking was admissible, stating that its "probative value is [sic] outweighed by the danger of unfair prejudice." [6] Likewise, the court concluded that L.I. could testify regarding the diaper incident. The court held

---

[6] The court stated the following regarding the choking incident:

> . . . that's relevant because that may explain why they didn't fully report or were afraid to report if they were afraid of the defendant, explaining why they were afraid of the defendant which is - includes witnessing a violent act during the week that they were at this house. That's - that's - the probative value is outweighed by the danger of unfair prejudice.

This statement appears to be a misstatement by the trial court or a court reporting error because it is not consistent with the court's findings and admission of the evidence that the Defendant had choked Ms. Rudd. The court was aware of its responsibility pursuant to Rule 404(b), and no party has argued that the court considered the probative value of this evidence to be outweighed by the danger of unfair prejudice. Accordingly, we infer that the court intended to say that the probative value was *not* outweighed by the danger of unfair prejudice, which is the only interpretation consistent with the court's other statements and evidentiary ruling on this issue.

that a material issue existed as it related to the Defendant's touching the baby, that the evidence was clear and convincing, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The court held that the evidence "created fear" in the victims, was "highly relevant" to proving why the victims might have delayed reporting the abuse, and corroborated Ms. Rudd's testimony. The court, however, held that the incident in which the Defendant put his exposed penis between his daughter's legs was inadmissible.

After the offer of proof and in the presence of the jury, M.N. testified that she believed the Defendant would kill her if she "told on him." M.N. said that she believed the Defendant's threat because she had seen him hurt his children and yell at and choke Ms. Rudd. Defense counsel made a Rule 404(b) objection to M.N.'s testimony. The trial court overruled the objection without making findings.

*A.*        *Evidence Regarding the Diaper Change Incident*

The Defendant contends that the trial court erred by admitting evidence that he penetrated his baby's bottom with his finger during a diaper change because this act was similar to acts for which he was charged and was unfairly prejudicial. The State argues that the court followed Tennessee Rule of Evidence 404(b)'s procedural requirements, did not abuse its discretion, and caused the Defendant no injustice.

The trial court held a hearing outside the jury's presence and heard testimony regarding this incident. The court found that a material issue existed as it related to the victim's fear, that the evidence was clear and convincing, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Because the court substantially complied with the procedural requirements for Rule 404(b), we will apply an abuse of discretion standard of review. The record reflects that L.I. testified she felt scared watching the Defendant's finger penetrate the baby's bottom because, in her mind, it caused the baby to "scream . . . in pain." The court found that this evidence caused L.I. to fear the Defendant would hurt her and that L.I.'s fear was relevant to explain her reluctance and delay in reporting the abuse.

We are mindful that "proof regarding sexual abuse of a child victim is always inflammatory to some degree." *State v. Hubert Glenn Sexton, Jr.*, No. E2022-00884-CCA-R3-CD, 2024 WL 390336, at *23 (Tenn. Crim. App. Feb. 2, 2024) (holding that the defendant's abuse of a minor and his threat to kill her father if she revealed the abuse was admissible to show motive for murder). However, the record reflects that the court did not apply an incorrect legal standard, reach an illogical or unreasonable decision, or base

its decision on a clearly erroneous assessment of this evidence. There was overwhelming trial evidence presented by the victims in support of the conviction offenses. The evidence of the diaper change incident was admitted for the impact it had on the victims, and the court gave a limiting instruction to the jury.[7] We conclude that the court did not abuse its discretion by admitting this evidence. The Defendant is not entitled to relief on this issue.

### B.    M.N.'s Testimony Regarding Choking of Ms. Rudd

---

[7] The trial court provided the following jury instruction:

If from the proof you find that the defendant has committed crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. The evidence may only be considered by you for the limited purpose of determining whether it provides:

The complete story of the crime; that is, such evidence may be considered by you where the prior crimes and the present alleged crimes are logically related or connected, or are part of the same transaction so that proof of the other tends, or is necessary to prove the one charged, or is necessary for a complete account thereof;

A scheme or plan; that is, such evidence may be considered by you if it tends to establish that the defendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that the proof of one tends to establish the other;

That is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged;

The defendant's intent; that is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime for which he is presently charged;

Guilty knowledge; that is, such evidence may be considered by you where guilty knowledge is an essential element of the crime charged and evidence of the other offenses tends to establish that the defendant possessed this knowledge at the time of the commission of the crime presently charged.

Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purposes other than those specifically stated.

*See* T.P.I. 42.10(a).

- 28 -

The Defendant contends that the trial court erred by admitting M.N.'s testimony that the Defendant choked Ms. Rudd. The Defendant argues that the court failed to comply with Rule 404(b)'s procedural requirements in this regard and that the probative value of this evidence was outweighed by its unfair prejudice. The State counters that the court substantially complied with Rule 404(b)'s requirements and did not abuse its discretion. Alternatively, the State argues that any error was harmless.

The record reflects that the trial court did not hold a hearing or make findings pursuant to Tennessee Rule of Evidence 404(b) when M.N. testified at the trial that the Defendant choked Ms. Rudd. However, the court had already addressed the admissibility of that factual account when Ms. Rudd testified outside the presence of the jury that the Defendant choked her and that he did so in the presence of the victims. The court found that Ms. Rudd's testimony was corroborated by a scar on Ms. Rudd's neck, that the evidence was material, and that the evidence was relevant to explain the minor victims' reluctance to fully report the abuse. The court also weighed the evidence's probative value against the possibility of unfair prejudice and found it admissible. Because the court analyzed this evidence pursuant to Rule 404(b)'s procedural requirements during Ms. Rudd's testimony, we conclude that it was not necessary for the court to repeat the analysis during the trial when M.N. testified that the Defendant choked Ms. Rudd. The court substantially complied with the procedural requirements for Rule 404(b) during the evidentiary hearing regarding Ms. Rudd's testimony, and we will apply an abuse of discretion standard of review.

The record reflects that M.N.'s trial testimony was consistent with Ms. Rudd's testimony of the choking incident. The additional information M.N. provided was that the incident made her fearful of the Defendant. However, after Ms. Rudd's testimony, the trial court had already concluded that the choking incident would cause the victims to fear the Defendant and make them less likely to report any abuse. This consideration was incorporated in the court's 404(b) analysis at the conclusion of Ms. Rudd's testimony. We conclude that the court did not apply an incorrect legal standard, reach an illogical or unreasonable decision, or base its decision on a clearly erroneous assessment of this evidence. Furthermore, as we previously noted, the court gave a limiting instruction to the jury regarding this evidence. We disagree with the Defendant that "acts of physical violence [are] too prejudicial to be heard by the jury" and note that the Defendant has not provided any legal precedent in support of this proposition. We conclude that the court did not abuse its discretion by admitting this evidence. The Defendant is not entitled to relief on this issue.

# VII

## Authentication of Diagram

The Defendant contends that the trial court erred by admitting a diagram because it was not properly authenticated. Specifically, the Defendant alleges that A.N. initially failed to recognize the diagram that was used during A.N.'s forensic interview with Ms. Womack and that A.N. only admitted that she recognized the diagram after the State suggested that her initial answer was wrong. The State argues that the court did not err by admitting the diagram and that the prosecutor did not suggest an answer to A.N.

The diagram was a drawing of the front and back of a girl's naked body with the terms "boobies," "monkey," and "bubble" written on it to identify a girl's breasts, vagina, and buttocks, respectively. The diagram also had red circles around those areas, the left arm, and the back of the head. The following exchange occurred during A.N.'s testimony:

[State]: [A.N.], I want to show you something really quick, okay? This is what I just marked as Exhibit Number 7. Do you recognize what I'm showing you?

[A.N.]: (Indicating yes).

[State]: Is that a yes?

[A.N.]: (Indicating yes).

[State]: I need you to say yes or no for me.

[A.N.]: Yes

[State]: Okay. What do you – what is that?

[A.N.]: My private parts.

[State]: And the private part on the front, what did you used to call it?

[A.N.]: A monkey.

[State]: Can you say that for me again?

[A.N.]: A monkey.

[State]: And the private part on the back, what did you used to call it?

[A.N.]: A bubble.

[State]: And have you seen this before, State's – have you seen this piece of paper before?

[A.N.]: No.

[State]: Did you – did you draw on this piece of paper?

[Defense counsel]: I'd just say it's asked and answered. She said she'd never seen it before.

[Court]: That's overruled. Go ahead.

[State]: Did you ever draw on this paper?

[A.N.]: Yeah.

[State]: What – do you see that there is different colors on the paper?

[A.N.]: Yeah.

[State]: What color did you draw on?

[A.N.]: This one (indicating).

[State]: In red?

[A.N.]: Yes.

[State]: You – do you remember when you drew on it in red? And let me ask you a different question, that was a bad question. Do you remember what you were doing when you drew on it in red?

- 31 -

[A.N.]: That like interview thing.

[State]: The forensic interview?

[A.N.]: Yeah.

As a predicate to admissibility, a witness with knowledge of the facts must verify and authenticate evidence, and its relevance must be demonstrated. *State v. Banks*, 546 S.W.2d 947, 949 (Tenn. 1978); *see* Tenn. R. Evid. 401, 901(a), (b)(1). The authentication requirement "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The party offering the evidence is required to "reasonably establish the identity and integrity of the evidence"; however, "this rule does not require that the identity . . . be proven beyond all possibility of doubt[.]" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)).

Rule 901 provides, in pertinent part:

(b) Illustrations. — By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of Witness With Knowledge. – Testimony that a matter is what it is claimed to be.

. . . .

(4) Distinctive Characteristics and the Like. – Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with other circumstances.

. . . .

Tenn. R. Evid. 901(b). Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The record reflects that A.N. was age eleven at the time she testified in court and that being in court made her "a little nervous" and "uncomfortable." She testified that the diagram identified specific terms that she used when referring to a vagina (monkey) and buttocks (bubble) before being asked if she recognized the diagram. Although she initially responded that she did not recognize the diagram, immediately thereafter, she acknowledged that she had drawn the red circles on the diagram during her forensic interview. Her testimony is consistent with the terms and markings on the diagram and with the forensic interviewer's testimony. The court did not abuse its discretion by admitting this evidence. The Defendant is not entitled to relief on this issue.

## VIII

### Expert Testimony

The Defendant contends that the trial court erred in admitting testimony from Ms. Womack, an expert in conducting forensic interviews, because she testified outside her area of expertise. The Defendant argues that Ms. Womack was not qualified to discuss a victim's active versus non-active disclosures of abuse or how trauma affected a victim's disclosures. The State counters that the court did not err by allowing the testimony, and, alternatively, that any error was harmless.

During her testimony, Ms. Womack explained why a child might not be ready to talk about abuse on one occasion, i.e., a nonactive disclosure, and still be able to talk about the abuse later, i.e., an active disclosure. Ms. Womack stated that a victim's disclosure "a lot of times . . . depends on how the child feels with their safety." Ms. Womack also testified that "trauma affects the brain greatly, and it can actually rewire the brain which is not my expertise."

Tennessee Rule of Evidence 702 provides the following foundation for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 provides, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Our supreme

court has also said that, in assessing the reliability of an expert's methodology, a trial court may consider the expert's qualifications and the connection between the expert's knowledge and the basis of his or her opinion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274-75 (Tenn. 2005). "[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of trial court." *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263 (1997); *see State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). An appellate court may disturb the trial court's ruling only if the trial court abused or arbitrarily exercised its discretion. *McDaniel*, 955 S.W.2d at 263-64.

The record reflects that Ms. Womack received training in understanding children's sexual abuse and children's disclosure of abuse. The trial court recognized her as an expert in the field of conducting forensic interviews and noted that, based on her experience, Ms. Womack was "not an expert on trauma, but . . . an expert on interviewing people who have perhaps experienced [trauma]." Testimony regarding why a victim might or might not be willing to disclose abuse during a forensic interview is within the scope of Ms. Womack's expertise as recognized by the court. The record reflects that the victims testified to making incomplete disclosures during their forensic interviews and that the victims attributed any discrepancies between their interviews and trial testimony to their fear and immaturity. Ms. Womack's testimony added no new information regarding those discrepancies. The court did not abuse its discretion by admitting Ms. Womack's testimony regarding why a child might not be willing to discuss certain abuse during a forensic interview.

Similarly, Ms. Womack testified that children who have experienced trauma might be able to recall more specific details after the passage of time. Addressing this issue, Ms. Womack related her experience that children are often able to "think clearly" and articulate facts regarding abuse after they are "farther removed from the abusive situation." Ms. Womack also stated that "[t]rauma affects the brain greatly, and it can actually rewire the brain—which is not my expertise." The trial court admitted this latter testimony over the Defendant's objection because the court found that it was based on Ms. Womack's observations as a forensic interviewer and because Ms. Womack said she was not an expert regarding how trauma affects the brain. The court determined that Ms. Womack's testimony about the effects of trauma was based upon her observations of working with children of abuse and that her background and years of experience in this area provided a foundation for her opinion. Ms. Womack disclaimed expertise as to how trauma affected the brain, and the victims, themselves, explained to the jury why they delayed disclosing certain facts during their forensic interviews. The court did not abuse

its discretion in admitting this testimony. The Defendant is not entitled to relief on this basis.

## IX

## Sentencing

The Defendant contends that the trial court erred by ordering consecutive sentencing on all counts. The Defendant does not contest the length of the individual sentences. The State counters that the court did not abuse its discretion in aligning each of the counts of the Defendant's sentence consecutively because the court relied on multiple consecutive sentencing factors to support its decision. *See* T.C.A. § 40-35-115.

At the sentencing hearing, the trial court received as exhibits the presentence report and a psychosexual evaluation. The presentence report indicated that the then-fifty-seven-year-old Defendant had a criminal history that began when he was forty-nine years of age and included charges for traffic offenses; assault; public intoxication; aggravated assault; and resisting stop, frisk, halt, arrest, or search. The Defendant reported that he completed high school but could not read, that his health was "fair," that he had been diagnosed with depression, and that he had been admitted to a hospital for an overdose. Although the Defendant initially reported that he did not drink alcohol or use illegal substances, he later reported drinking alcohol and using cocaine, methamphetamines, THC, and psychedelic mushrooms. The Defendant reported that he had not worked since 2000 and that he had a good relationship with his five siblings. The Defendant also reported fleeing to California to avoid incarceration in this case. The Strong-R risk and needs assessment determined that the Defendant had a moderate risk to reoffend. The psychosexual evaluation made the following determinations: (1) the Defendant presented a moderate-high risk to reoffend without sex treatment; (2) the Defendant presented a moderate-high risk to act out; (3) the Defendant demonstrated a history of anti-social thinking and activity; (4) the Defendant had a history of substance use and difficulty in following rules; (5) the Defendant's amenability to respond positively to sex offender treatment was poor; and (6) the Defendant should not be alone with minors.

The trial court also received victim impact statements. A.N. wrote that she no longer felt "comfortable around old men" and that she "can[']t walk down anyw[h]ere." K.N. wrote that she "can't be alone with grown men without thinking they are going to do stuff with me. I can't walk by myself anywhere without feeling uncomfortable. I can't trust anyone." K.N. also wrote that to feel safe, she would like to see the Defendant

- 35 -

"FOREVER IN JAIL."  M.N. wrote that if the Defendant were released from jail, she feared that he would "come find us and kill us like he said."  M.N. said that she did not "trust any grown man because of him" and reiterated that she and her sisters "will never feel safe."

Tennessee Department of Correction Probation and Parole officer Brittany Broughton testified that the Defendant provided conflicting information regarding his substance use and was not forthcoming that he had two children with Ms. Rudd.  Ms. Broughton said the Defendant maintained his innocence and admitted fleeing to California to avoid arrest.  Ms. Broughton said she assessed the Defendant as having a "moderate risk level" and noted that he had no prior sexual offenses.

L.I.'s adoptive mother[8] testified that L.I. had been diagnosed with PTSD, took antidepressant medication, and "hate[d]" the Defendant.  She said that L.I. had difficulty trusting people and managing her anger and that she was very fearful.

Kimberly Jones, the Defendant's sister, testified that the Defendant was helpful to his family and community and that she never witnessed his mistreating children.  She said that she would trust him with her grandchildren.  On cross-examination, she said that she was not aware that the Defendant had choked Ms. Rudd or violated an order of protection.  She stated that she was aware that the Defendant avoided arrest by staying with their older brother.

Scott Stiner, Jr., the Defendant's son, testified that he had a good relationship with his father growing up and that the Defendant started having problems after he began a relationship with Ms. Rudd.  Mr. Stiner said he believed the Defendant was innocent of the charges.  On cross-examination, Mr. Stiner said he only saw the Defendant and Ms. Rudd "maybe every other weekend or so" and did not attend the trial.

Karen Baker, a family friend, testified that she had known the Defendant for approximately twenty years.  Ms. Baker said that many years ago, the Defendant looked after her then-kindergarten-aged daughter and that no allegations or indications of abuse resulted.  Ms. Baker said that she had no reason to believe the Defendant would be a danger to the community.  On cross-examination, Ms. Baker acknowledged that she did not attend the trial and was unaware that the Defendant had used illegal substances other than marijuana.  Ms. Baker's husband, Robert Baker, testified that his children had been

---

[8] L.I. had been adopted by her foster parents by the time of the sentencing hearing.

alone with the Defendant and that no allegations or indications of abuse resulted. Mr. Baker described the Defendant as "a good friend." On cross-examination, Mr. Baker acknowledged that he was unaware of the Defendant's "personal life," including his use of illegal substances.

Donnie Dawson, the Defendant's son's friend, testified that he had known the Defendant since he was age eight and that the Defendant had never acted inappropriately toward him or others. Mr. Dawson described the Defendant as "[o]ne of the best men I've ever met." Mr. Dawson said that he would not consider the Defendant to be dangerous. On cross-examination, Mr. Dawson acknowledged that he did not know the Defendant had used methamphetamine or that the Defendant had been charged with aggravated assault and violating an order of protection.

Wayne Stiner, the Defendant's older brother, testified that the Defendant stayed with him to evade pending arrest warrants. Mr. Stiner agreed that he recalled a time when the Defendant was staying with him and the Defendant brandished a firearm to "run . . . off" law enforcement officers who were attempting to arrest the Defendant. Mr. Stiner said that he also recalled taking the firearm from the Defendant and that Mr. Stiner "sho[]t it up in the air." Mr. Stiner acknowledged that he was a convicted felon and that he had multiple firearms in his house at the time. On cross-examination, Mr. Stiner said that he had never seen the Defendant act inappropriately with children. Mr. Stiner believed that the Defendant was not dangerous and that the Defendant had "never done nothing like what he's accused of here."

The Defendant provided the following allocution:

I am innocent 100 percent in all these charges. I don't care who you'ns are or who's told you'ns to lie against me, but that is on you all. I'm sorry that has happened to you all, but I have not touched not a person, more less a child in any way, nor will I ever. That's all I got to say.

The parties agreed and the trial court found that the Defendant was a Range I offender for all counts. *See* T.C.A. § 40-35-105 (2025). The court considered the relevant principles of sentencing, the evidence submitted, and the other statutory factors it was required to consider. The court noted that the presentence report included prior misdemeanor convictions in Union County and evidence regarding substance use, including the use of methamphetamines, psychedelic mushrooms, and cocaine. The court found that the Strong-R assessment indicated the Defendant was a moderate risk to reoffend and a high risk for mental health and family support.

- 37 -

The trial court found the psychosexual evaluation to be "concerning," noting that the Defendant showed a moderate to high risk to reoffend without sex offender treatment and a moderate to high risk to behaviorally act out. The court considered the evaluation's recommendation that the Defendant "should not be alone with minors," and that the Defendant was not considered to be a good candidate for community-based sex offender treatment programs. Based upon the report and evaluation, the court found that the Defendant evidenced a "significant failure to accept any responsibility." The court gave heavy weight to the need for general deterrence of these types of crimes and found the likelihood of the Defendant's rehabilitation to be low. The court considered the necessity of confinement to protect society and avoid depreciating the seriousness of the offenses, and that the sentence should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. The trial court applied no mitigating factors. *See id.* § 40-35-113 (2019) (subsequently amended). Regarding Count 2, soliciting sexual exploitation of a minor, the court applied enhancement factors (1) that the Defendant had a previous history of criminal convictions or criminal behavior; (2) that the Defendant was a leader in the commission of an offense involving two or more criminal actors; (3) that the offense involved more than one victim; (6) that the personal injuries inflicted upon the victims were particularly great; and (14) that the Defendant abused a position of private trust. *See id.* § 40-35-114 (2019) (subsequently amended). Regarding aggravated sexual battery Count 3 through 6, the court applied enhancement factors (5) that the Defendant treated the victim with exceptional cruelty; (6) that the personal injuries inflicted upon the victim were particularly great; and (14) that the Defendant abused a position of private trust. *Id.*

The trial court sentenced the Defendant to six years for Count 2, solicitating sexual exploitation of a minor. For each of the aggravated sexual battery counts, Count 3 through 6, the court ordered the Defendant to serve twelve years at 100% service. The court ordered that all sentences be served consecutively for an effective fifty-four-year sentence in confinement.

The trial court concluded that consecutive sentencing was warranted because the Defendant had an extensive record of criminal activity, because the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor at a time when the Defendant was the minor's caregiver, and because the Defendant was a dangerous offender.

Tennessee Code Annotated section 40-35-115 provides, in relevant part, the following:

. . . .

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . . .

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high; [or]

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

(2019) (subsequently amended). The abuse of discretion with a presumption of reasonableness standard applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 589 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(10). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id*. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The trial court relied on three statutory provisions when ordering consecutive sentencing: that the Defendant has an extensive record of criminal activity, that the Defendant is convicted of two or more statutory offenses involving sexual abuse of a

minor, and that the Defendant is a dangerous offender. *See* T.C.A. § 40-35-115(b)(2), (4), (5).

## A.    *Extensive Record of Criminal Activity*

If the trial court finds that a defendant has an extensive record of criminal activity, the court should "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022); *see* T.C.A. § 40-35-115(b). In determining whether a defendant has an extensive record of criminal activity, a trial court should consider the amount, time, space, or scope of the activity. *Perry*, 656 S.W.3d at 129. Our supreme court has outlined the following non-exclusive considerations to which a court should look in making this inquiry:

(1)     The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;

(2)     The time span over which the criminal activity occurred;

(3)     The frequency of criminal activity within that time span;

(4)     The geographic span over which the criminal activity occurred;

(5)     Multiplicity of victims of the criminal activity; and

(6)     Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*Id.* (footnotes omitted).

The trial court concluded that the Defendant was eligible for consecutive sentencing because his criminal history was "quite extensive." The court considered the presentence report, which included prior convictions for assault and aggravated assault. The court considered that there were four victims in this case and multiple offenses commissioned upon more than one of those victims over the course of only one week. The court did not abuse its discretion in applying consecutive sentencing on this basis.

*B.*     *Offenses Involving Sexual Abuse of a Minor*

When considering whether consecutive sentencing is warranted for a defendant convicted of two or more statutory offenses involving sexual abuse of a minor, the trial court must consider aggravating circumstances such as "the extent of the residual, physical and mental damage to the victim or victims." T.C.A. § 40-35-115(b)(5). "[T]his court has found the existence of residual harm based on testimony from the victim or other non-experts." *State v. Doane*, 393 S.W.3d 721, 737 (Tenn. Crim. App. 2011) (citations omitted). Here, the trial court went to great lengths discussing how the circumstances surrounding the offenses were aggravated. The court also noted that the Defendant was in a position of private trust as a caregiver to the victims, who relied on the Defendant for food and care during the week they were at his house. The court considered the victim impact letters submitted by M.N., K.N., and A.N. and considered L.I.'s adoptive mother's testimony, showing that the victims suffered residual mental harm. The court did not abuse its discretion in applying consecutive sentencing on this basis.

*C.*     *Dangerous Offender*

The trial court concluded that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high. *See* T.C.A. § 40-35-115(b)(4). The court noted that "the way that these girls were treated over the course of that week was among the most inhumane set of circumstances that I've ever heard of." The court recognized that the victims were already suffering from a physical disability because of "extreme hunger." The court noted that this was "probably [the] top two worse set of facts that I've heard" and that "I had a very difficult time letting [this case] leave my mind because of how disturbing it was and because of how credible the girls that testified were." The court considered that the circumstances surrounding the commission of the offenses were aggravated, including uncharged conduct consisting of aggravated sexual battery and the Defendant's instructing Ms. Rudd to "prepare" the victims. The Defendant was in a position of private trust during the commission of the offenses. He voluntarily undertook to feed and house the victims and used this arrangement as a means to accomplish his egregious sexual abuse of them. The court found that, based on the Defendant's work history and the psychosexual report's findings, "confinement for an extended period of time [wa]s necessary to protect society from the [D]efendant's unwillingness to lead a productive life." The court concluded that a

lengthy sentence "more reasonably relate[s] to the offenses for which the [D]efendant stands convicted."

Whether the evidence is sufficient for the trial court to conclude that the Defendant was a dangerous offender is a more difficult question. Although the record reflects that the Defendant choked Ms. Rudd and threatened to kill the victims if they disclosed the abuse, Tennessee Code Annotated section 40-35-115(b)(4) requires that a dangerous offender have (1) little regard for human life and (2) no hesitation about committing a crime in which the risk to human life is high. This court has previously rejected the premise that a defendant convicted of aggravated sexual battery could meet the statutory requirements to be considered a dangerous offender. *See State v. Hayes*, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995), *perm. app. denied* (Tenn. May 8, 1995). Regardless, the evidence establishing that the Defendant meets the other two statutory options for consecutive sentencing is overwhelming. *See* T.C.A. §§ 40-35-115(b)(2), -115(b)(5).

The trial court did not abuse its discretion by ordering consecutive service of each of the Defendant's sentences. *See id.* § 40-35-115(b). We have considered the Defendant's reliance on *State v. Osborne*, in which the defendant was sentenced to a combination of concurrent and consecutive sentences. 251 S.W.3d at 23-29. We disagree that *Osborne* requires that the Defendant receive a combination of consecutive and concurrent sentences. *Osborne* predates our supreme court's decisions establishing a presumption of reasonableness to a court's sentencing determination. *See Pollard*, 432 S.W.3d at 859; *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Furthermore, sentencing is highly individualized and is based on the facts of the case and relevant statutory considerations. The court in the present case did not abuse its discretion in ordering complete consecutive service. The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE

- 42 -